UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

Allen M. Kraft,

       Plaintiff,

       v.

Carolyn W. Colvin,
Acting Commissioner of Social Security
Administration,

       Defendant.

Case No. 4:13-CV-63-JVB-JEM

**OPINION AND ORDER**

Plaintiff Allen M. Kraft seeks judicial review of the final decision of Defendant Carolyn Colvin, Acting Commissioner of Social Security, who denied his applications for Disability Insurance Benefits and Child's Insurance Benefits under the Social Security Act. For the reasons stated below, the Court affirms the decision of the ALJ and Social Security Administration.

**A. Procedural Background**

Plaintiff applied for Disability Insurance Benefits and Child's Insurance Benefits on October 21, 2010, alleging the onset of disability on June 30, 2009. (R. at 138–150.) Plaintiff's claims were denied and he requested a hearing in front of an Administrative Law Judge ("ALJ"). (R. at 76–87, 99–100.) His hearing was held on May 15, 2012. (R. at 34–69.) On May 23, 2012, the ALJ determined that Plaintiff was not disabled under the Social Security Act. (R. at 13–25.) The Appeals Council denied Plaintiff's request for review, making the ALJ's decision final. (R. at 1–3.)

1

**B. Factual Background**

**(1)** *Plaintiff's Background and Testimony*

Plaintiff was born in 1990. (R. at 138.) He completed high school and received his diploma in May 2009. (R. at 206.) Before applying for disability, Plaintiff worked at several places, including Payless Grocery Store from April to July 2006. (R. at 207, 227.) He retrieved shopping carts from the parking lot and bagged groceries. (R. at 227.) He claims that assisting individuals who needed help putting their groceries in their cars made him feel very overwhelmed. (R. at 227.)

From July to August 2007, Plaintiff worked at Burger King. (R. at 228.) He testified that he watched the automatic grill but was let go because he missed too much work due to feeling overwhelmed. (R. at 228.) After that, Plaintiff worked at Wal-Mart from April 2008 to June 2009. (R. at 229.) During his four hour shift, Plaintiff did things such as watering plants, unloading trucks, shelving plants, and loading dirt and mulch for customers into their vehicles. (R. at 229.) However, he felt this job was very overwhelming and called in a lot, resulting in Plaintiff losing the job. (R. at 234.)

Plaintiff worked from May to June of 2010 in the youth job program through INDOT, where he mowed grass and moved rocks. (R. at 230.) During the second week of the job, he was asked to work on a bridge where, according to him, he became so overwhelmed he never returned to the job. (R. at 230.)

During Plaintiff's hearing, he testified that not only did he work in the garden department of Wal-Mart, but he also worked the register. (R. at 41.) However, Plaintiff said he "couldn't deal with [it]" because he felt like people would criticize him or "think that [he] was doing bad." (R. at 41.) He testified that he had to give up the job because he "couldn't deal with talking to people and the situation

2

was just overwhelming for [him]." (R. at 42.) However, it was later determined that he was actually fired for missing too many days and playing on his cell phone while working. (R. at 206.)

He also testified that he "can't drive very far" because he gets overwhelmed and has to turn around and go back home. (R. at 43.) He plays games on his phone "pretty much all day because [he's] trying to cope with [his] illness." (R. at 44.) Plaintiff stated that he no longer burns himself because his "mom said that if [he] burn[s himself] again she'd take [his] computer and television away." (R. at 44.) He further testified that he is "just generally a dirty person." (R. at 45m 50.) He showers roughly every two to four weeks and that's only when his "mom gets tired of [the smell] and [threatens] to take away [his] privileges to [his] computer and [his] television." (R. at 49.)

He smokes cigarettes all the time because he's consistently nervous and although previously denied smoking pot, later admitted that he did it recreationally. (R. at 52, 55.) He also stated that he is not obsessed with cleanliness, but instead his obsessive-compulsive disorder stems from "repetitive stuff." (R. at 45.) When asked about the jobs Plaintiff is capable of doing, he stated that he would "feel overwhelmed" doing repetitive tasks because "I just don't like [them]." (R. at 53.)

**(2)** *Medical Evidence*

Plaintiff claims he suffers from depression, obsessive-compulsive disorder, severe anxiety, learning problems, self-mutilation, asthma, and is suicidal. (R. at 205).

Plaintiff first applied for Child Disability benefits in October 2010, claiming his inability to work started in June 2009. (R. at 138–39.) Medical records start in March 2007 when Plaintiff started going to his treating physician, Dr. Buonnano. (R. at 327.) During this first visit, Dr. Buonnano diagnosed him with depression and obsessive-compulsive disorder, prescribing Wellbutrin, Prozac, and Luvox. (R.

3

at 327.) At the second meeting, Plaintiff was referred to Dr. DiCarlo for therapy. (R. at 327.) In November 2007, there was a discussion regarding the "homebound instruction" that Plaintiff received in March 2007 at the request by Dr. Buonnano. (R. 482–83.) His homebound education allowed him higher grades than he was receiving while going to a public school. (R. at 485.)

He continued visiting Dr. Buonnano through October 2010. (R. at 327.) In June 2007, Plaintiff stated he was feeling better and was job hunting. (R. at 326.) In November 2007 it was noted that Plaintiff was still depressed, but his OCD was not as prevalent as in previous months. (R. at 325.) In January 2009, he stated he was anxious over starting school and keeping his job at Wal-mart. (R. at 323.) In June 2009, Dr. Buonnano observed that Plaintiff is burning and cutting himself. (R. at 323.) In May of 2010, it was recorded that he was failing classes because of his anxiety. (R. at 230.)

Dr. DiCarlo failed to provide any medical records that demonstrate his clinical conclusions regarding Plaintiff and instead sent personal letters that subjectively state his findings. (R. at 344, 372, 402.)

In December 2010, Plaintiff visited Dr. Gupta. (R. at 333–35). Dr. Gupta determined that Plaintiff was suffering from severe depression, anxiety, OCD, suicidal behavior, and self-mutilation. (R. at 335.) However, it was noted that a learning disability was not present. (R. at 335.) Plaintiff followed up with a visit to Dr. Brown, a state agency reviewing physician. (R. at 337–40.) Dr. Brown noted no impairment in Plaintiff's ability to sustain concentration and attention, and no report of suicidal ideation. (R. at 339.) She assessed Plaintiff as suffering from obsessive-compulsive disorder, panic disorder with agoraphobia, and major depressive disorder. (R. at 339.)

In January 2011, Dr. Clark identified Plaintiff as suffering from ADHD, a major depressive disorder, OCD, general anxiety, and a panic disorder. (R. at 347–52.) Dr. Clark suggested that

4

Plaintiff's statements concerning the severity of his symptoms are only partially credible due to the medical evidence demonstrating he is capable of carrying out, remembering, and understanding semiskilled tasks as well as attending to tasks for a sufficient amount of time necessary to complete what is required. (R. at 363.)

Dr. Ascough met with Plaintiff in April 2011. (R. at 375–80.) He diagnosed Plaintiff with major depressive disorder, obsessive-compulsive disorder, anxiety disorder, and problems relating to social environments, occupation, and an inability to handle his own finances. (R. at 379.)

In May 2011, Plaintiff met with Dr. Johnson, who concluded Plaintiff has the mental capacity to understand, remember, and carry out moderately complex instructions, as well as the ability to sustain attention and concentration skills to carry out tasks when limited to only brief, superficial interactions with others. (R. at 384.) She determined that Plaintiff has mild restrictions in activities of daily living, and moderate difficulties in maintaining social functioning, concentration, persistence, and pace. (R. at 395.)

In December 2011, Plaintiff was admitted to River Bend Hospital for an apparent suicide attempt, but in Plaintiff's own words "I was arguing with my mom over a car I wanted to sell to get a Rolex off of eBay. She thinks I overdosed on Xanax but I actually poured 20 Xanax down the toilet to try to scare her." (R. at 430.) He was discharged before the mandatory seventy-two hour hold was complete and sent home with his mother. (R. at 432.)

Plaintiff's medications include Abilify, Prozac, Strattera, Lithium, Wellbutrin, and Xanax.

**(3)** *Vocational Expert's Testimony*

Vocational Expert Richard Fisher ("VE") testified at Plaintiff's hearing before the ALJ. (R. at 62–68.) The ALJ first presented the VE with a hypothetical using Plaintiff's age, education, and work experience. (R. at 64.) This individual would be limited to "a simple, routine, repetitive task, no more than brief superficial interaction with coworkers, supervisors, and the public." (R. at 64.) The VE stated that this individual would be able to do several jobs, including a day worker, laundry laborer, production assembler, and housekeeping/cleaner. (R. at 64.)

The second hypothetical is the same as the first, except with no public contact. (R. at 65.) The VE eliminated day worker and housekeeping/cleaner, because an individual may come into contact with somebody else probably once a week. (R. at 65.) However, an individual would still be able to work as a laundry laborer and production assembler. (R. at 65.)

Next, the third hypothetical had the same limitations, except an individual would be off task 20% of the day. (R. at 66.) The VE said there were no jobs. (R. at 66.) Last, the fourth hypothetical included the same information, only an individual would be absent one day a week, unscheduled. (R. at 66.) The VE stated there were no jobs for such person. (R. at 66.)

**(4)** *ALJ's Decision*

The ALJ found that Plaintiff was not disabled from June 30, 2009, through the date of the decision. (R. at 13–14.) The ALJ determined that Plaintiff has the following severe impairments: attention deficit hyperactivity disorder (ADHD), a major depressive disorder, obsessive compulsive disorder (OCD), and a generalized anxiety disorder with a panic disorder. (R. at 16.) The ALJ also found Plaintiff's asthma is non-severe and discredits any claim of a learning problem or disability. (R. at 16.) Overall, Plaintiff does not have an impairment that meets or medically equals the severity of one

6

of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1, nor does the severity of Plaintiff's mental impairments meet the criteria of listings 12.02, 12.04, 12.06, and 12.08. (R. at 16.)

The ALJ further found that consistent with two state agency psychologists, Plaintiff "has a mild restriction in activities of daily living, moderate difficulties in social functioning, moderate difficulties in concentration, persistence or pace, and . . . experienced no episodes of decompensation . . . of extended duration." (R. at 17.) Plaintiff's allegations of severe symptoms are greatly diminished by his credibility, which after several conflicting statements, held no weight when the ALJ made his decision. (R. at 19.) The ALJ held that Plaintiff is able to perform work that exists in significant numbers in the national economy. (R. at 23.)

### C. Standard of Review

Under the Social Security Act, an individual is allowed judicial review of a final decision by the Commissioner of Social Security. 42 U.S.C. § 405(g). When under review, this Court must determine that ALJ's decision was supported by substantial evidence and made under the correct legal standard. *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Substantial evidence is defined as including relevant evidence that a reasonable mind might then accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 390 (1971). It is the duty of the ALJ, and not this Court, to consider facts and the credibility of witnesses, weigh evidence, resolve evidence conflicts, or substitute its own judgment for that of the ALJ. *Perales*, 402 U.S. at 399–400; *Boiles v. Barnhard*, 395 F.3d 421, 425 (7th Cir. 2005); *Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000). This Court will, however, ensure that the ALJ built an "accurate and logical bridge from the evidence to his conclusion so that, as a reviewing court, we may access the validity of

the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). Assurance is needed that ALJs "sufficiently articulate [their] assessment of the evidence to assure us that [they] considered the important evidence . . . to enable us to trace the path of [their] reasoning." *Id.* (quoting *Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999)).

**D. Disability Standard**

To qualify for Disability Insurance Benefits or Child's Insurance Benefits, an individual claimant must establish that he or she suffers from and meets a disability listed within the Social Security Act. A disability is "an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security Administration established a five-step inquiry to evaluate whether a claimant qualifies for disability benefits. A successful claimant must show:

> (1) he is not presently employed; (2) his impairment is severe; (3) his impairment is listed or equal to a listing in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) he is not able to perform her past relevant work; and (5) he is unable to perform any other work within the national and local economy.

*Scheck v. Barnhart,* 357 F.3d 697, 699–700 (7th Cir. 2004). An affirmative answer leads to either the next step, or on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter,* 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it then shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

**E. Analysis**

Plaintiff asserts three primary issues upon appeal: (1) whether the ALJ properly evaluated the opinions of Plaintiff's treating psychiatrist and therapist; (2) whether the ALJ should have asked for an updated opinion from a medical expert; and (3) whether the ALJ properly accounted for Plaintiff's claim of a concentration deficiency when determining the jobs Plaintiff could perform in the national economy. (DE 22, at 16, 21–22.)

This Court must decide whether the ALJ's decisions regarding the weight placed on Plaintiff's treating psychiatrist and therapist as well as his determination regarding Plaintiff's claim of a concentration deficiency were reached under the correct legal standard and supported by substantial evidence. *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013). For the reasons explained below, the Court affirms the decision of the ALJ.

**(1)** *The ALJ properly evaluated the opinions of Plaintiff's treating psychiatrist and therapist*

Plaintiff's claim that the ALJ failed to properly weigh the opinions of his treating psychiatrist and psychotherapist does not require remand. Typically, more weight should be given to treating sources, "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairments[.]" 20 C.F.R. § 404.1527(c)(2). ALJs must explain why they reject specific evidence regarding a treating physician. *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004). When determining what weight to give to a treating physician, an ALJ must take the following into consideration: (1) the length, nature, and extent of the relationship between doctor and patient; (2) the frequency of visits made; (3) how much support physicians give for their opinions; (4) the consistency of the opinions with the record provided; (5) the specialization of the

treating physician; and (6) other factors that either support or contradict the opinion. 20 C.F.R. § 404.1527(c)(2)–(6); *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009). However, an ALJ "need not give controlling weight to a treating physician's opinion if it is not supported by objective clinical findings" and conflicts with other substantial evidence. *Henderson ex re. Henderson v. Apfel,* 179 F.3d 507, 514 (7th Cir. 1999.); *see* 20 C.F.R. § 404.1527(d)(2). 20 C.F.R. § 404.1527(d)(3) further states that an ALJ will give more weight to an opinion that provides a better explanation of objective medical findings.

The opinion of Dr. Buonnano was properly given less weight than other medical opinions. Despite completing a recent mental medical assessment in April 2012 that weighed heavily in favor of the claimant (R. at 453.), Dr. Buonnano's findings were inconsistent with all other medical opinions as well as the claimant's own statements. (R. at 22, DE 27 at 5.) Through Plaintiff's own testimony and OCD diagnoses, the ALJ determined he was capable of simple, routine, and repetitive tasks. (R. at 17.) An ALJ may discount a treating physician's medical opinion if it is internally inconsistent with the opinion of a consulting physician and he articulates his reasoning for rejecting the treating physician's opinion. *Skarbek v. Barnhart,* 390 F.3d 500, 503 (7th Cir. 2004). For example, Dr. Buonnano's April 2012 opinion was highly inconsistent with Dr. Baker, who evaluated Plaintiff during an emergency visit for apparent attempted suicide in December 2011. (R. at 22, 431.) It was later determined that this was not an actual suicide attempt, but rather Plaintiff poured twenty Xanax tablets down the toilet and told his mother he took them in response to not getting his way when she refused to let him sell his car to get a Rolex watch. (R. at 19–20, 430.) Plaintiff's attention seeking behavior is further confirmed as he testified during his hearing that he had not burned himself in three months because his mother threatened to take away his computer and television. (R. at 44–45.)

During the December 2011 emergency room visit, Dr. Baker found mostly normal mental findings and released Plaintiff after twenty-four hours instead of the requisite seventy-two. (R. at 430–33.) The ALJ relied on Dr. Baker's opinion in conjunction with the opinion of consultative examining psychologist Dr. Brown, who in December 2010 claimed Plaintiff had no severe impairment. (R. at 337–40.) The ALJ gave little weight to Dr. Brown's low Global Assessment of Functioning of the Plaintiff, as it was based on Plaintiff's own reports of self-mutilation, which as demonstrated by Dr. Baker's opinion and hospital records, is unfounded and for different purposes than Plaintiff claims. (R. at 21, 337.) A January 2011 opinion by Dr. Clark notes, despite some limitations, Plaintiff could still understand, remember, and carry-out semi-skilled tasks, relate on a superficial basis with co-workers and supervisors, focus on a task for a sufficient period of time necessary to complete it, and manage stress when performing these tasks. (R. at 21, 363.) Finally, state agency reviewing psychologists Dr. Johnson and Dr. Ascough in April and May 2011 agreed with Dr. Clark's assessment. (R. at 375–380, 383.)

Further evidence indicates inconsistent findings with treating psychologist Dr. Buonnano. For example, Plaintiff graduated high school with mostly As and Bs. (R. at 290–91, 454, 483.) He also attended two years of college and admits that while working at Wal-mart, he felt he had no issues talking to customers. (R. at 320, 323, 325.) In November 2011, Plaintiff was working with a vocational rehabilitation service to find a job, where he expressed interest in customer service because that's where he "shines the most." (R. at 18–19, 444, 450.)

The ALJ also properly dismissed the opinion of Dr. DiCarlo. Medical opinions need to be based on objective observation and not a recitation of a claimant's subjective complaints. *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004). "An ALJ may properly reject a doctor's opinion if it appears to be based on a claimant's exaggerated subjective allegations." *Dixon*, 270 F.3d at 1178. Dr. DiCarlo failed

11

to provide any treating records in support of his opinion, claiming that, although he had seen Plaintiff as a child and continued counseling him in college, he no longer had access to any of these records. (R. at 19, 401–03.) Instead, Dr. DiCarlo provided a narrative from memory, rather than stating a medical opinion, which summarized the Plaintiff's complaints while providing no clinical findings. (R. at 19, 401–02.)

All this information overwhelmingly concludes that the ALJ did not err in placing any weight on Drs. Buonnano's and DiCarlo's opinions. From the evidence presented, the ALJ logically concluded that the doctors' findings were inaccurate and would not be accepted or considered when making his determination. The ALJ understood Plaintiff's treating physicians' opinions, but chose not to accept their findings. This does not require any further information from Dr. Buonnao and Dr. DiCarlo, and their opinions were correctly given no weight and dismissed.

**(2)** *The ALJ did not need to get an updated opinion from a medical expert*

Plaintiff's claim that the ALJ should have asked for an updated opinion of a state agency medical physician is unfounded and unnecessary. (DE 22 at 21.) Worsening symptoms of a claimant requires new evaluation. *Parker v. Astrue*, 597 F.3d 920, 925 (7th Cir. 2010). There are two circumstances in which an ALJ must obtain updated medical evidence. SSR 96-6p. The first is when no additional medical evidence is received but the ALJ finds that a judgment of equivalence may be reasonable, and the second is when additional medical evidence is received that, in the ALJ's opinion, alters the state agency medical or psychological consultant's findings. SSR 96-6p. However, neither of these circumstances occurred here and the ALJ does not need to ask for an updated opinion. There were no periods of decomposition or visits to the hospital indicating a worsening of symptoms between

12

Plaintiff's December 2011 emergency room visit and the hearing and ALJ's decision in May 2012. Because of this, there was no need to take into account the April 2012 assessment by Drs. Buonnano and DiCarlo or require a new opinion by a state agency reviewing physician.

The ALJ properly concluded that Plaintiff's attempts to self-mutilate were not a result of a mental impairment, but instead evidence of Plaintiff's extreme measures to accomplish his goals. (R. at 19.) As such, the ALJ successfully interpreted the evidence presented and determined that the need for an updated opinion was unnecessary.

**(3)** *The ALJ properly accounted for Plaintiff's concentration deficiency when determining what jobs Plaintiff could perform in the national economy*

Plaintiff's claim that the ALJ improperly accounted for a concentration deficiency from Plaintiff's mental RFC when determining the jobs Plaintiff could perform in the national economy does not require remand. *O'Connor-Spinner v. Astrue* states that an ALJ is required to fully inform the VE of a claimant's limitations, including any deficiencies "of concentration, persistence and pace." 627 F.3d 614, 619 (7th Cir. 2010). There are three exceptions to this rule: (1) where the record indicates the VE has independently viewed a claimant's medical records or heard testimony about those limitations; (2) when the ALJ has used alternative wording and it is clear that this phrasing excluded tasks that a claimant with those limitations would be unable to perform; and (3) where the ALJ's hypotheticals mention the underlying conditions that have directly caused a claimant's deficiency in concentration, persistence, or pace. *Id.* at 619–20.

However, the ALJ properly disregarded the limitations stated by Drs. Buonnano and DiCarlo because he had already reasonably rejected their opinions and did not have to include their findings into the hypotheticals presented to the VE. *Jens v. Barnhart,* 347 F.3d 209, 213 (7th Cir. 2003). (DE 27, at

13

16, R. at 18–22.) Although Plaintiff claims he has issues with concentration, persistence, and pace, he informed Dr. Ascough that he typically plays video games, uninterrupted, for up to six hours at a time. (R. at 379.) He also told the ALJ that he plays games on his phone "pretty much all day" in order to cope with his disabilities. (R. at. 44.) Despite the contrary evidence demonstrating Plaintiff's ability to focus for long periods of time, the supposed failure by the ALJ to include all information does not reach the *O'Conner–Spinner* test and fits within one of the exceptions stated above. The ALJ chose not only to include limitations on simple, repetitive, and unskilled work, but also accounted for Plaintiff's social anxiety and his lack of ability to perform no more than brief and superficial interactions with co-workers, supervisors, and general public which specifically applies to both the second and third exceptions. *Id.* at 19–20; (R. at 17, 23.)

Thus, the ALJ did take into consideration Plaintiff's alleged concentration deficiency and properly chose how to include it in his hypotheticals to the VE.

**F. Conclusion**

The Court affirms the decision of the ALJ.

SO ORDERED on March 24, 2015.

                                                s/ Joseph S. Van Bokkelen
                                                JOSEPH S. VAN BOKKELEN
                                                UNITED STATES DISTRICT JUDGE